## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Docket No.: 17-cr-197-01 |
| | ) | |
| v. | ) | |
| | ) | Judge Tanya S. Chutkan |
| HOLLIE NADEL, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT HOLLIE NADEL'S SENTENCING MEMORANDUM

Defendant Hollie Nadel respectfully requests, pursuant to 18 U.S.C. § 3553(a) and *Gall v. United States*, 552 U.S. 38 (2007), that this Honorable Court impose a sentence of probation. This sentence would be sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). Ms. Nadel had an extraordinarily limited role in the criminal activity to which she has admitted involvement, she has proven to be a hard-working and responsible individual while on pretrial release for seven years, and she has provided valuable assistance to law enforcement officials for over seven years. That cooperation has led to the successful prosecution of six defendants of decidedly greater culpability than Ms. Nadel, who is undeniably a victim of human trafficking. Ms. Nadel has used her own experiences to help others – becoming an advocate for victims of human trafficking. Her advocacy for trafficking victims has led to potential groundbreaking federal legislation, and, indirectly, the freedom of two other women from the clutches of Ms. Nadel's chief tormentor, Gina Russell.

### I.       Introduction

This Court has inherited an extraordinary case, unlike almost any other prosecution in this District's history. A family of grifters—living entirely outside of the law, unwilling to work legitimately or pay taxes, and raising children without schooling—developed skills of

manipulation and abuse that have apparently been passed down for generations within their intermarrying family.

Hollie Nadel, on the other hand, had been living a relatively normal life, supported by her parents and highly successful in both high school and college. While a student at Ithaca College (PSR ¶129), friends would refer to her as "Mom" because of her responsible ways and aversion to the partying lifestyle so many young adults embrace during those years. After graduating with a degree in Theatre Production and Design in 2006 (PSR ¶129) Hollie took her knowledge and work ethic to the stage and television industry, where she quickly developed an excellent reputation and was employed by shows such as *Madame Secretary* and *Guiding Light*, while also working with on and off-Broadway theater productions.

These two worlds collided in 2009. Hollie had lost an important job when *Guiding Light* was cancelled by CBS, and, at the same time, was navigating the end of a failed romantic relationship. When walking home from short term employment one evening, Hollie was beckoned to the front stoop of a New York city apartment occupied by Gina Russell and her family (hereafter "the Evans Family"). Curious and happy to distract herself from the mild depression of her current circumstances, Hollie made the fateful mistake of allowing Gina to tell her fortune. Although Hollie is an intelligent and capable young woman, she was no match for the low cunning of Gina, Candy, Robert, Corry and Tony Evans, and Archie Kaslov. They harnessed their manipulative skills to slowly but surely make Hollie believe in their mystic abilities, to alienate her from her family, and to steadily pry money from Hollie's family and servitude from Hollie herself. This was no overnight operation, but a slow and steady descent into Hell. Friends and family recognized

something harmful was taking place but felt incapable of stopping it.[1] By the end, Hollie suffered physical abuse (later admitted by Gina in proffers), a Pavlovian responsiveness to any and all "needs" of the Evans crime family, and a willingness to sacrifice every dollar of her earnings to her controllers. After eight years, Hollie was reduced to living out of a suitcase while performing sexual favors for strangers seeking her out through Backpage.com. She was an empty shell of the "Mom" who had loved family, who was gainfully employed, and who had seemed on track to a successful and traditional middle-class existence.

### The End of the Beginning

Ironically, the only reason the horrific abuse and manipulation ever ended in Hollie's case is because the Evans Family landed a spectacular, if criminal, success. The fleecing of Daniel Zancan for over $4 million dollars through a number of increasingly high extortionate demands, would prove too noticeable and impactful to escape the attention of law enforcement. It became the core of this criminal prosecution, and it also served to eclipse the victimization of Hollie Nadel.

By the time the Zancan scheme was over, the Evans Family had millions of dollars, lovely homes and the fanciest of cars in their possession—a criminally-derived lifestyle that allowed them to luxuriate in places such as Malibu and Key West. They had done nothing to actually earn these new-found riches, other than abuse and manipulate their tool, Hollie Nadel. While the family was celebrating with social media pictures and waving gold bars in the air, the years of strain, abuse and sleep deprivation were rapidly aging Hollie. She had developed a chronic cough and suffered weight loss and endless anxiety. PSR ¶116. Alienated from her family, she dutifully obeyed her handlers while secretly hoping for something akin to divine intervention.

---

[11] "Hollie seemed not herself—anxious, scared, distant… And then she was gone." (Elizabeth Hartman); "…her personality changed to always being anxious, worrisome and unhappy." (Hilary & Edward Davidson); "She was removed, distant, always anxious…She had become a hollowed-out shell of herself, like something had stolen her soul." (Susan Nadel).

As law enforcement began to close in because of the magnitude of Zancan's embezzlement to pay them, the Family closed ranks at the expense of Hollie. First, they made her sign a bogus confession, taking the full blame for the Zancan scheme. PSR ¶47. Then, they bullied her into a ridiculous videotaped confession (PSR ¶63) where she announced her blame for everything that had happened to Mr. Zancan while exonerating the people who had controlled the entire scheme—from making the increasingly large extortionate demands, to requiring gold bars instead of cash, to posing as mobsters and engaging in surveillance. Not content to solicit such falsehoods, the Evans Family had Hollie marry[2] Gina in an effort to enlist spousal privilege as yet another obstructionist shield to thwart law enforcement, to the embarrassment of the battered and bewildered new spouse of Gina. PSR ¶45. Finally, in anticipation of an interview with the FBI (PSR ¶48) Hollie was drugged and successfully urged to parrot the exculpatory nonsense that the Evans Family was clinging to in their effort to avoid prosecution.

### The Beginning of the End

The closing in of the federal investigators on the Evans Family did not instantaneously break Hollie free from years of manipulation. She still feared and obeyed her controllers. She did not initially assist authorities seeking to arrest Mr. Zancan, although ultimately, she did help secure his apprehension, and she found herself detained in the D.C. jail for 56 days. While it was a fearful and strange existence for a young woman from Long Island who had never received as much as a traffic ticket, it also began to bring her back to a normal, supportive world of family and freedom that she had not experienced in eight years.

Hollie soon had an important choice to make. Federal prosecutors who were focused on the Zancan extortion were interested in securing her cooperation. While there is some simmering

---

[2] The sham marriage was annulled by the State of New York on March 18, 2019. PSR ¶ 103.

dispute between the parties as to exactly how the AUSAs presented this opportunity to Hollie, the bottom line is that she accepted responsibility for her participation in the scheme, and even though she had legitimate defenses, she believed accepting the plea offer and cooperating was the only way in which her tormenters were likely to face indictment. Consequently, she met with the AUSAs and FBI agents in December of 2017 and testified before the Grand Jury in April of 2018.

On May 7, 2018, Ms. Nadel pleaded guilty to conspiring to commit wire fraud and laundering of monetary instruments, in violation of 18 U.S.C. § 371, but her moral culpability in obeying her manipulators is clearly limited. Until falling into their clutches, Ms. Nadel was living a productive, law-abiding and promising life. Her story, described in more detail below, is a hellish descent into almost cult-like conditions, and its gradual but powerful escalation into emotional, physical, financial and sexual abuse was only halted when FBI agents arrested her in hopes of enlisting her cooperation.

In light of the nature of the offense, Hollie Nadel's superb character, the unequivocally clear demonstration of rehabilitation since her arrest, and her successful cooperation with law enforcement officials, along with all of the factors of 18 U.S.C. § 3553 taken together, a sentence of probation is more than enough to meet the goals of sentencing and to provide justice in this case.

## II.    Personal Background

Hollie Nadel is a 40-year-old woman with no prior criminal history. She graduated *cum laude* from Ithaca College with a 3.49 GPA. PSR ¶ 129. For the entirety of her adult life outside of her manipulation by the Evans Family, she has been gainfully employed. PSR ¶ 132-142. She only occasionally drinks alcohol, and she does not smoke, PSR ¶ 125. Since her arrest in this case, she has regularly received counseling. PSR ¶ 120-122. As a result of her experiences in this case, Hollie has become an advocate for human trafficking victims, providing consultations or regularly

advising entities such as Polaris, Three Strands Global Foundation, Survive and Thrive Advocacy Center, and the Human Trafficking Legal Center. PSR ¶ 135-136, 144. While she suffered trauma, alienation from family, and financial devastation at the hands of the Evans Family, there is nothing in her personal background that suggests she presents a risk of recidivism.

### How Could This Happen?

With all of the stable and traditional aspects of Hollie Nadel's life, how is it that she could be sucked into a predatory criminal milieu and manipulated into criminality? Particularly back in 2017, this question seemed built on an implausible premise—that a family of grifters with little to no formal education possessed and used a type of *low cunning* that could successfully turn a person like Hollie Nadel into a part of their scheme. But since that fateful day of arrest in 2017, the investigation has corroborated her story and there have been national and international stories of human trafficking with parallels to the case at hand.

Part of the answer to this question is that the skill set of Gina Russell and others in manipulating, deceiving, isolating and controlling human beings should not be underestimated. When Gina Russell appeared to cooperate with the Government, her proffers eventually conceded (if grudgingly) that Hollie's account was indeed accurate. She acknowledged physical abuse of Hollie (FBI 302 from 12/17/18 proffer of Evans) and she apparently confirmed that none of the proceeds of the Evans Family's schemes were kept by Hollie. While she would ascribe various roles to other Family members, the core story of isolation, manipulation, and coercive pressure was corroborative of Hollie's description of her will being eroded over time.

The reason that Hollie credited Russell for having psychic powers was largely due to two destructive moments in Hollie's life that appeared to have been predicted by Gina. First, in trying to isolate Hollie from her family, Gina claimed that if Hollie returned to her family, her father

would simply incarcerate her. As it turned out, when Hollie in fact returned to Long Island, her father was so distraught by the changes in his daughter that he obtained a 72-hour mental hospital lockdown. (Amy Nadel letter).

Even more dramatically, during the escalating financial pressure to force Hollie into full-time prostitution (2014-15), Gina predicted that Hollie REDACTED , as a way of controlling Hollie from afar. The very next day, Hollie REDACTED in Connecticut. FBI 302 (from 4/9/19 proffer of Russell). Russell claimed to have had no involvement in REDACTED , but she did admit taking a "told you so" approach to the event, both when initially reported to her and in an ongoing fashion. From that day forward, Hollie believed that Gina somehow possessed psychic powers.

Since 2017, there have been numerous investigations and prosecutions involving human trafficking that have shattered the stereotypical model of violent pimps accompanying runaways or drug addicts with checkered pasts. The "NXVIM" sex slave case brought national and international headlines to a cult-like existence where successful women like television actress Allison Mack became sexual slaves to the NXVIM leader.[3] The slaves were forced to respond to their "masters" anytime day or night, causing them to be sleep-deprived.

In France, members of five Roma families were prosecuted for forcing Bulgarians with disabilities to beg in France, with brutal force employed to ensure the Bulgarians turned over their money to the "masters."[4]

---

[3] Alberto Luperon, *Smallville Actress Allison Mack Pleads Guilty in NXIVM Sex Cult Case, Says She Was 'Misguided'*, LAW & CRIME (Apr. 8, 2019, 1:02 PM), https://lawandcrime.com/high-profile/smallville-actress-allison-mack-pleads-guilty-in-nxivm-case-says-she-was-misguided/.
[4] *Horror Story About Bulgarian Slaves – Beggars in France*, NOVINITE.COM (June 10, 2018, 6:22 PM), https://www.novinite.com/articles/190582/Horror+Story+about+Bulgarian+Slaves+-+Beggars+in+France#google_vignette.

In 2019, a Texas teenager helped expose a well-organized and well-networked ring of predators who targeted a high schooler and indoctrinated her into a new "family." She received no money personally but was "so brainwashed that she thought she was doing it for the greater good of her surrogate family."[5]

Across Europe, there have been "juju" prosecutions, where African immigrants are intimidated by traffickers performing Voodoo rituals and convinced to engage in prostitution.[6]

Closer to home, there are increasing amounts of "psychic scam" prosecutions, where "curse removal" or other psychic-related promises rack up shockingly high tabs from individuals who presumably should know better. (Sherry Uwanawich's bilking of $1.6 million from a Houston victim[7]) or a Maryland woman who proclaimed herself a genuine Gypsy psychic who was prosecuted for "curse curing" at the cost of $340,000 to her victims.[8]

Obviously, each human trafficking case has its own unique wrinkles, but the primary point is that there is greater recognition than ever that victimhood is not predicated upon some sort of "at risk" categorization or physical kidnaping, and that the chains of prolonged psychological manipulation weigh heavy.

Of course, the strongest proof of Hollie's honest depiction came from the horrific discovery of new victims succumbing to the Evans Family tactics. The Government's motion to revoke Gina Russell's pretrial release referred to the discovery of "criminal conduct eerily similar to what she admitted to as part of her plea agreement in this case," and concluded with the observation that

---

[5] Charlotte Cuthbertson, *Sex-Trafficking Survivor and Her Mom Fight Modern-Day Slavery*, THE EPOCH TIMES (Nov. 24, 2019) https://www.theepochtimes.com/us/trafficking-3152248.

[6] For example, *UK Jury Convicts Nurse Who Used Voodoo in Trafficking Women*, ASSOCIATED PRESS (June 28, 2018 10:00 AM) https://apnews.com/general-news-edaf1f1806ae4fcf84ab5d18b79a6bbb.

[7] *Florida Woman Pretended to Be Psychic to Bilk $1.6 Million From Family*, HUFFINGTON POST (Sept. 11, 2019, 6:31 PM), https://www.huffpost.com/entry/sherry-tina-uwanawich-fake-psychic_n_5d7973f9e4b0a938a42da2d5.

[8] Shomari Stone, *Montgomery County 'Psychic' Sentenced to 6 Years for Scamming Clients*, NBC WASHINGTON (Sept. 24, 2018, 12:37 PM), https://www.nbcwashington.com/news/local/maryland-psychic-sentenced-to-6-years-for-scamming-clients/155294/.

Russell has once again "encouraged a woman to lie to her family and engage in sex work for the sole purpose of enriching herself." ECF 495.

## III.    Requirements for Sentencing

By statute, this Court is required to fashion a sentence that is sufficient, but not greater than necessary, to comply with the four purposes of sentencing: just punishment, general deterrence, protection of the public, and rehabilitation. 18 U.S.C. § 3553(a); *see also Tapia v. United States*, 564 U.S. 319, 325 (2011). In deciding whether a particular sentence satisfies these goals, the Court must consider various factors, including (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to achieve the purposes of sentencing; (iii) the kinds of sentences available; (iv) the kinds of sentence and sentencing range established for such offenses under the U.S. Sentencing Guidelines; (v) the need to avoid unwarranted sentencing disparities; and (vi) the need to provide restitution to the victims of the offense.

Sentencing requires several distinct steps. First, the district court must correctly calculate the applicable sentencing range under the Sentencing Guidelines. *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)). Second, the district court must determine the sentences requested by the parties and make a case-specific assessment based on the facts presented. *Id.* at 191 (citing *Gall*, 552 U.S. 49-50). Finally, the court must provide an adequate record "to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* The D.C. Circuit has explained that this process is to ensure that all defendants appearing before a court for sentencings are considered as individuals, *Id.,* a tremendously important principle in a case as unique as this one.

IV.    **Proper Application of the § 3553 Sentencing Factors Justifies a Probationary Sentence.**

Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing district courts to impose a sentence sufficient, but not greater than necessary to achieve the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Sentencing under § 3553(a) therefore requires the Court to start with the *minimum* sentence permissible and add only so much additional punishment, if any, as necessary to achieve the goals of sentencing. As discussed below, fair consideration of these statutory sentencing factors establishes that a sentence of probation will sufficiently serve the goals of § 3553(a).

A.    **Factor One: The Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

i.    **The Nature and Circumstances of Ms. Nadel's Offense**

Ms. Nadel has admitted to a serious economic offense with an accompanying Guideline range of great severity. But, as described above, the underlying facts are considerably less inculpatory and damaging than the guideline range would suggest. In particular, all monies obtained by the Evans Family were for their exclusive use. Not only did Hollie receive none of the proceeds generated by their scheme, PSR ¶ 68, but she was financially ruined by their predatory use of her name and credit. While Hollie has agreed to the stipulated loss of roughly $4.2 million, the ensuing, and draconian, 18-level enhancement to the base offense is a serious distortion of blameworthiness in this particular case.

Hollie's involvement in criminality was an extraordinarily unusual situation. She was literally a tool, used by a manipulative family that kept her fearful and submissive while they collected millions of dollars through her.

### ii. <u>Ms. Nadel's History and Characteristics</u>

Hollie had never been arrested, and she has no criminal history. The conduct for which she has accepted responsibility is undeniably serious and will have significant consequences. As a result, the most important aspect of this prosecution is to ensure that between punishment, rehabilitation, and deterrence, a sentence is achieved that makes this first contact with the criminal justice system the last one for Hollie Nadel. We respectfully submit that there is ample evidence to support the expectation that Ms. Nadel will never re-offend and that she will fully satisfy this Court, if given an opportunity to prove herself on probation.

**a.    Hollie Nadel is an Individual of Extraordinarily Good Character.**

Presented under separate cover from this memorandum are character references from 16 people describing the qualities and conduct of Hollie Nadel. They refer to her as "patient, understanding, compassionate, and humble…" (Shauna Devitt) or "loving, generous [and] selfless." (Amy Nadel). People that have known her for many years, and who know her life's trajectory, describe Hollie as "the most inspirational person in our lives," (Hilary & Edward Davidson) or simply conclude, "Hollie is my hero." (Lenore Bronstein). Aside from family, Hollie has a strong support network, and it is one that provides deep praise for her character, her work ethic, and how she has turned her own tragedy into a vehicle for helping others.

**b.    Hollie Nadel has Dedicated her Life to Fighting Human Trafficking.**

Hollie's dedication to keeping other victims from suffering the same harm she endured for eight years is clearly demonstrated by her advocacy work with several organizations. Since 2020, she has worked with the Human Trafficking Legal Center, serving as an Advisor for the organization and raising community consciousness by participating in events like the "On My Side

Awards." PSR ¶ 109. The Center's Director, Martina Vandenberg, describes Hollie as having become "a leader in the anti-trafficking movement" and as someone who "has devoted thousands of hours to advocating for justice for trafficking survivors in the United States."

In 2019, she participated in a number of workshops for mental health professionals treating the trauma suffered by sexual abuse and human trafficking victims, and in 2021 she coordinated with Wells Fargo and a law firm to institute the "Survivor Inclusion Initiative," a program where bank personnel develop and utilize protocol to assist survivors with their banking needs.

As Hollie's reputation for expertise and transparency has risen, so have the opportunities to effect change. Beginning last year, Hollie began working with Congressional staffers, anti-trafficking organizations, and legislative advocates to promote important legislation, such as the Trafficking Survivors Relief Act and The Debt Bondage Repair Act. In support of this legislation, she spoke with various members of Congress,[9] explaining the devastating effect of financial manipulation by traffickers when it comes to re-establishing credit, applying for loans, and even applying for housing. She is scheduled to speak with the REDACTED ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

Last year she served on a panel discussing actions that financial institutions can take to spot the red flags of human trafficking before an audience of anti-money laundering specialists and Office of Foreign Assets Control ("OFAC") representatives. Similarly, earlier this year she trained anti-money laundering specialists at a seminar for United Services Automobile Association ("USAA Bank") and in March she addressed the National Governors Association on collateral consequences for trafficking survivors, state actions to support trafficking victims, and important legislation at the state and federal level.

---

[9] For example, Congressman Chris Smith (R-NJ), Senator Marsha Blackburn (R-TN), Senator Catherine Cortez Masto (D-NV) and Representative Sheila Jackson Lee (D-TX).

Those who have benefitted from hearing her story have described Hollie as a "remarkably resilient woman, determined to make a difference in the world, and dedicated to making sure that other people do not fall prey to such horrendous victimization." (Lisa Ferentz).

> **c.    Hollie's Plight Inspired Other Victims of Gina Russell to Break Free from Servitude.**

Even after this case had spanned more than six years, there was an extraordinary development. "Cooperating" defendant Gina Russell was discovered to be victimizing another human trafficking victim in Los Angeles. The Government's motion to revoke Russell's bond expressly acknowledged the absolute—and stunning—similarity of Hollie's mistreatment and the newly discovered manipulation of "Victim 1." In reality, there were two new victims of the Evans Family, with one being controlled by Gina's sister ("Victim 1") and the other by Gina herself ("Victim 2").

The backstory of Victim 1's surfacing is amazing. Victim 1 had come to the Santa Monica, California area with very little resources. She grew depressed and was in dire straits financially. She met Gina's sister, who provided a "psychic reading" and began making ominous prophecies designed to make Victim 1 pay increasingly impossible amounts of money to ward off negative events. These exorbitant demands, in turn, pushed Victim 1 into prostitution, and the bulk of her proceeds went directly to Gina's sister. Like Hollie, she even purchased a vehicle in her name (and on her credit) for the family. Rolex watches and Gucci baby clothes were purchased by Victim 1 to provide to her handler.

Victim 1's boyfriend had grown increasingly concerned about her descent into the family's clutches, and he urged her to recognize that she was losing control of her life. Victim 1 fought that contention, even after the boyfriend showed her an article about a similarly subjugated victim. It

was only then that the couple discovered a DOJ press release from the case involving Hollie, and Victim 1 finally broke free from the Evans Family.

When Gina Russell's pretrial release was revoked, and certainly at the time of her sentencing, this Court became aware of the second victim of human trafficking.[10]

Victim 2 spent years in musical theater and had a serious interest in music, television, and film acting. In a relatively short period of time, she lost her manager and agent, and broke her arm. After a successful surgery on her broken arm, Victim 2 moved to Los Angeles in January of 2023. Walking home from a night shift at a restaurant, she was accosted by Gina Russell, who was insistent on giving her a "psychic reading." From that limited beginning, the relationship evolved into one where Victim 2 saw Gina regularly, with Gina describing spiritual negativity in Victim 2's life. Like in the case of Hollie, Gina slowly isolated Victim 2 from her own loved ones, and increasingly high amounts of cash were poured into Gina's "spiritual assistance," including $45,000 in Canadian dollars. Victim 2 succumbed to Gina's instruction of engaging in prostitution, and even with the money coming in from that source, Gina successfully convinced Victim 2 to lie to her father about financial needs, resulting in nearly $190,000 being provided to Gina or her sister. Victim 2 also purchased two cars for Gina.

When Victim 2 was leaving the courthouse after a shoplifting hearing involving Gina's sister, she was accosted by a documentary filmmaker who was working on a film about psychic scams. Victim 2 was initially reluctant to speak with the filmmaker, but because the filmmaker had been speaking with Victim 1 and could provide details of Victim 1's subjugation, Victim 2 realized that she was in the same situation, and she broke off from Gina.

---

[10] In the Government's pleadings relating to this development, there are references to "Victim 1." For purposes of this memorandum, however, Victim 1 was the original victim of the Evans family in 2018, and Victim 2 is the more recent victim, and the one directly attributable to Gina Russell's conduct. (thus referred to in the Government pleadings as "Victim 1").

In an indirect way, then, Hollie's willingness to cooperate and to pursue her traffickers has led to two other victims breaking free from identical abuse and manipulation. Neither Victim 1 nor Victim 2 are facing any criminal charges, and Victim 1 has now provided a videotaped statement for the Court's consideration at sentencing.

Hollie Nadel is not a woman who requires a prison sentence to adjust her conscience. She feels acute shame and guilt, but also steely resolve, and she has no intention of ever placing herself and her family in such a situation again. Importantly, she has the character and support system to make that intention a reality.

> ### d. Hollie has Proven to be a Hard-Working and Successful Employee for Seven Years.

Before her subjugation to the Evans Family, Hollie was always gainfully employed and ambitious. She is known to have "an extraordinary work ethic" by her sister, Amy, and many others. Employed by shows such as *Madame Secretary* and *Boardwalk Empire*, Hollie's future was bright until her encounter with Gina Russell.

After her arrest and initial incarceration, Hollie Nadel's old work-ethic returned. She worked at Muscari Flowers and Events for more than 2½ years, advancing to the position of Director of Operations and Special Events until she got the opportunity to work for Snowcreek Consulting. At Snowcreek, she quickly advanced to the position of Director of Operations. PSR ¶ 138. Handling a variety of HR responsibilities, Hollie has led two successful transitions to payroll and timekeeping platforms, established the company's first health insurance benefits program, handled all invoicing and billing duties, ensured compliance with state and federal regulations, led the plan development for the company's first 401(k) plan, and identified and vetted potential employees. PSR ¶ 139. In short, she has been placed in a position of trust, with access to sensitive information, and she has consistently exceeded expectations.

Despite all of her success with Snowcreek, its General Counsel has confirmed that due to the company's involvement with federal government contracts, a felony conviction will force the company to fire Hollie.

In 2022, Hollie founded her own human resource and recruiting company, called Fabric Framework, LLC. She had four contracts in 2023 that generated almost $50,000 in profit, but to date in 2024 she has not had any contracts. PSR ¶ 140-142. The consequences of this felony conviction will be severe, as she will lose a rewarding job that she has held for almost four years.

### B. Factor Two: The Purposes of Sentencing

Under 18 U.S.C. § 3553(a)(2), a district court must consider the need for the sentence to: (i) reflect the seriousness of the offense and provide just punishment; (ii) afford adequate specific and general deterrence; (iii) protect the public from further crimes; and (iv) provide the defendant with necessary rehabilitative services.

### i. Reflect the Seriousness of the Offense and Just Punishment

The first goal of sentencing—retribution and just punishment—is premised on the notion of proportionality. *Neal v. United States*, 516 U.S. 284, 292 (1996) (quoting United States Sent'g Comm'n, *Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* 26 (Aug. 1991)). The principal of proportionality recognizes that the punishment should "fit the crime," and "reflect the gravity of the defendant's conduct." *United States v. Wilson*, 350 F. Supp. 2d 910, 916 (D. Utah 2005) (quoting S. Rep. No. 98-225 at 75-76 (1984), *reprinted at* 1984 U.S.C.C.A.N. 3182, 3258-59). As the *Wilson* court explained:

> From the public's standpoint, the sentence should be of the type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing recurrence of the offense. From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.

*Id.* at 916-17 (quoting S. Rep. No. 98-225).

While there is obviously no precise calculation to associate with a just punishment, a probationary period, with its accompanying threat of potential imprisonment for a young woman with no prior criminal history is substantial. Coupled with the various collateral effects of a federal felony conviction, as well as continued court supervision, there is no doubt that Hollie's involvement in enriching the Evans Family has led to serious punishment, in terms of her treatment by the Family, unending damage to her professional prospects, and, perhaps most lastingly, a profound sense of shame for Ms. Nadel.

To the extent this Court feels compelled to impose punishment upon Ms. Nadel, we would respectfully urge the Court to consider community service and/or renewed electronic home monitoring. Neither seems particularly necessary in this case, but both are better than renewed imprisonment.

### ii. Specific and General Deterrence

 The concept of general deterrence will be more than met by imposing a probationary sentence in this case. The limited media interest in this case likely ensures that whatever sentence is imposed remains well out of consideration for other individuals engaging in financial crimes, but the basic message from such a sentence will remain a stern one, both for Ms. Nadel specifically and for anyone who gains knowledge of this case.  Ms. Nadel's conduct will have led to consequences such as:

- being saddled with a felony conviction for the rest of her life
- truncating her career opportunities for the rest of her life
- shame and embarrassment amongst family, friends, and social contacts
- extended and intrusive probationary supervision for years
- the possibility of court-ordered restitution despite her complete lack of proceeds

In the context of a strikingly unusual and individualized situation, the casual observer would likely assess the sentence as a reasonable one that will deter others, as well as Ms. Nadel specifically. This is particularly true in the unusual context of a coconspirator being permitted to submit victim impact statements at the sentencing proceedings for Candy Evans, Archie Kaslov, Robert Evans and Gina Russell.

### iii. Rehabilitation and Protection of the Public

#### a.   Hollie has Demonstrated Respect for the Law and has Made Admirable Efforts Toward Rehabilitation.

Ms. Nadel's post-offense conduct in this case is extraordinarily encouraging. She has proven to have respect for the seriousness of this prosecution and for this Court by perfectly complying with her conditions of release since release on December 20, 2017. Her initial restrictions were significant – including electronic monitoring, a curfew, no travel without the Court's permission, and having her parents serve as third party custodians.

Temporary, and later permanent, adjustments to the conditions of her release were always complied with in full. In 2018, Hollie was allowed to travel on five occasions for religious services, self-defense classes, job interviews, and family travel. PSR ¶ 17. In each case there was no complication.

On September 18, 2018, the curfew restriction was lifted and she was allowed to travel within portions of New York and New Jersey (necessitated by her job organizing events for Muscari Flowers) without Court permission. Once again, no problems ensued.

On January 18, 2019, Hollie was released from electronic monitoring and allowed to report by telephone. In the 5 ½ years that have followed that modification, Hollie has been in perfect compliance.

Five months later, her domestic travel restriction was lightened further so as to allow pretrial services to approve the travel without Court involvement.

On October 14, 2021, Hollie was permitted to move to Virginia to live closer to Snowcreek Consulting, and her third-party custodian requirement was consequently lifted as well.

As the restrictions were modified or lifted, Hollie continued to show responsibility and respect, never violating her conditions of release over a period of **80 months**.

Importantly, this significant track record demonstrates that Ms. Nadel is a negligible risk for recidivism and an individual who fully recognizes her need to obey the law. In short, she has already demonstrated that she is a low-risk offender and one whose rehabilitation is well underway, seven years after her arrest in this case. Imprisonment, then, would only be a vehicle for punishment, but rehabilitation and protection of the public are already firmly established due to Hollie's family and community support, her cooperation with law enforcement officials, and her already impressive personal character.

> **b.    Hollie's has Cooperated with and Provided Substantial Assistance to the Government.**

After eight years of isolation and indoctrination, it is safe to say that Hollie's choice to cooperate with the Government was not a particularly easy decision. But, as described in further detail below, Ms. Nadel made that decision and began proffering with the Government in late 2017 and into early 2018. In April of 2018, she testified before the Grand Jury that issued the indictment against the Evans Family members, and she made herself available for trial in each defendant's case. Hollie was even in the unusual position of being allowed to submit victim impact statements to the Court, and her submission for Gina Russell's sentencing (attached here as Exhibit A) is particularly poignant and likely proved helpful to this Court in recognizing the degree of harm associated with Gina's criminal conduct.

19

It is beyond dispute that sentencing judges can consider post-offense conduct in fashioning an appropriate sentence. *See e.g.*, *Gall*, 552 U.S. at 59 (post-offense conduct, rehabilitation, and youthfulness at time of offense deemed legitimate bases for downward variance); *United States v. Harrington*, 947 F.2d 956, 962–63 (D.C. Cir. 1991) (post-offense rehabilitation could support downward adjustment for acceptance of responsibility, despite defendant maintaining innocence). Hollie Nadel's post-offense conduct has been exemplary in a number of aspects, including her performance on supervised release, her pursuit of personal and professional goals, and her bona fide effort to assist the government in pursuing their case against six other defendants.

### C. Factors Three, Four and Five: the Kinds of Sentences Available, the Sentencing Range, and Policy Statements

Ms. Nadel has been convicted of conspiracy to commit bank fraud and money laundering. The statutory range for such a conviction is zero to five years of imprisonment. We have been advised that the government will move for a downward departure under U.S.S.G. § 5K1.1, based upon Ms. Nadel's substantial assistance to law enforcement officials.

### i.   Stipulated Guideline Factors

#### a.   Loss Amount, Applicability of Certain Adjustments, and Timely Acceptance of Responsibility

The parties have agreed to many aspects of the final advisory Guidelines calculation: first, that the loss attributable to the defendant exceeds $3.5 million but is less than $5 million. Financial hardship to one or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(iii) raises the offense score by two levels, as does the adjustment for causing loss of over $1 million from a financial institution (U.S.S.G. § 2B1.1(b)(16)(A)). Unfortunately, Ms. Nadel's initial dishonest proffer with the government, completely scripted and coerced upon her by Candy Evans and Gina, provides a basis for adding two more points to her offense score, pursuant to U.S.S.G. § 3C1.1. The total offense score for conspiracy, then, is 30 before adjustments or departures.

The defense fully anticipates that the U.S. Attorney's Office will maintain its position that the timely acceptance of responsibility in this case warrants a 3-level reduction to the offense score and that the USAO Departure Committee will approve a guideline departure for Ms. Nadel's cooperation.

It should be noted that while the parties have agreed that no other departures will be sought, the Probation Office stated the following:

"Considering Ms. Nadel received an obstruction enhancement for following Candy Evans' directive, a departure for coercion and duress may be warranted. USSG §5K2.12." PSR ¶ 184. We contend that consideration of coercion or duress supports a variance from the ultimate guideline range.

**b.** **Departure for Substantial Assistance**

As noted above, the Government will be filing a motion for departure under U.S.S.G. § 5K1.1, although at this time they have not indicated to defense counsel the extent of the departure that they will recommend. From the defense perspective, whether categorized as a substantial assistance departure, or a variance from the advisory guidelines, or some combination thereof, we believe this provides an entirely supported basis for the imposition of a probationary sentence.

Ms. Nadel made the difficult choice to cooperate against her tormentors. She submitted for three days of questioning in December of 2017 and January of 2018, as well as a telephonic proffer later in 2018. In support of the Evans Family indictment, Ms. Nadel testified before the Grand Jury in April of 2018. As the cases slowly wound through the process of resolution, the defendants were aware that Ms. Nadel was cooperating with the Government. Although all the defendants ultimately pleaded guilty—thus negating the need for Hollie's live testimony—there is simply nothing else that Hollie could do for the Government. Notably, and unlike the cooperation of Gina

Russell, Hollie Nadel's perfect compliance with her conditions of release for seven years ensured her continued availability for trial if her live testimony was needed at any point.

> ii. **A Variance is Supported by the Unique Facts of This Case, Including Duress, Hollie's Limited Role in Forming and Executing the Scheme, and her "Zero-Offender" Similarities.**
>
> > a. **A Variance that Acknowledges Hollie's Limited Role is Appropriate.**

Ms. Nadel was a tool for the extortionate schemes perpetuated upon Mr. Zancan by a family of extraordinary cunning and greed. It is extraordinary that Ms. Nadel never received *any* of the proceeds of these schemes, instead living out of a suitcase and, during the latter portion of her servitude, providing sexual service to strangers to continue paying off her captors' increasingly high financial demands. Yes, the scheme triggers a loss calculation of over $3.5 million, but Hollie's accountability for being the physical vessel used by coconspirators to promote their lifestyle of big houses, big cars, and extravagant spending is overblown and calls out for a downward variance from the final applicable guideline range.

As articulated in *United States v. Ali*, 508 F.3d 136, 152 (3d Cir. 2007), "[m]inor role is not a departure factor. Instead, it is an adjustment under the Guidelines calculation at step one, which provides for a two-point reduction from the offense level for defendants less culpable than most other participants, but whose role cannot be described as minimal. *See* U.S.S.G. § 3B1.2 app. note 5." Thus, the court's anlsysis involves a comparative exercise with other defendants, recognizing the extent of culpability captured by the plea agreement and supporting facts. Here, it is clear from the facts of the case, as well as the now-admitted manipulation by Gina Russell, that a downward variance appropriately reflects those differences.

      **b.**      **A Downward Variance is Appropriate Because the Guidelines Substantially Overstate the Seriousness of the Offense.**

A below-Guidelines sentence is authorized and appropriate either as a departure or a variance because the economic crime Guidelines, U.S.S.G. § 2B1.1, substantially overstate the seriousness of this offense. *See* U.S.S.G. § 2B1.1, cmt. n.21(C) (departure); *Kimbrough v. United States,* 552 U.S. 85, 109-10 (2007) (variance).

There is a broad judicial consensus that the Guideline applicable to this case, U.S.S.G. § 2B1.1, produces unduly harsh sentencing ranges that bear little or no connection to the seriousness of the offense or the defendant's culpability in it. Judges across the country have found that "the loss guideline is fundamentally flawed" "because [it] no longer provide[s] a reasonable starting point for sentencing. Adjustments based on the amount of loss lead to astronomical sentences that have little connection to criminality." *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J., concurring); *see also United States v. Spencer*, 700 F.3d 317, 326-27 (8th Cir. 2012) (Bright, J. dissenting) (same). In *United States v. Emmenegger,* 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004), the court noted that "the Guidelines' provisions for theft and fraud place excessive weight on this single factor" and noted that the amount of loss is often "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."

"Many judges have criticized the Guidelines not only for their inflexibility, but also for their unnecessary harshness in many cases[.]" *United States v. Ranum*, 353 F. Supp. 2d 984, 986 (E.D. Wis. 2005) (imposing sentence for misapplying bank funds). The fraud Guidelines "have so run amok that they are patently absurd on their face." *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006). "[T]he numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice[.]" *United*

*States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012). "[T]he official guidelines are pegged to unhinged economic loss figures that mindlessly accelerate the resulting sentencing range." *United States v. Shapiro*, No. 14-cr-399 (ENV), 2022 WL 2758129, at *1 (E.D.N.Y. July 14, 2022).

"This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). And that is what courts have done. As one respected commentator has observed, "[s]ince *Booker*, virtually every judge faced with a top-level corporate defendant in a very large fraud has found that sentences called for by the Guidelines were too high." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent'g Reporter 167, 169 (2008).

> 1)   **Variances Are Particularly Appropriate Under the Fraud Guidelines Because the Guidelines Are Untethered to Any Empirical Connection Between Sentencing Calculations and Culpability.**

In *Kimbrough*, the Supreme Court held that a district court is free to sentence below the Guideline range where the particular Guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role" of "tak[ing] account of 'empirical data and national experience'" and results in a sentence that is "'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 109-10. Accordingly, following *Kimbrough*, courts have rejected particular Guidelines where they were not the product of empirical data or national experience.[11]

---

[11] *See Algahaim*, 842 F.3d at 800 (citing *Kimbrough* and concluding that sentencing courts may impose non-Guidelines sentences in light of the "unusualness" of the Guidelines approach); *United States v. Henderson*, 649 F.3d 955, 962-63 (9th Cir. 2011) (endorsing variances from Guideline-prescribed ranges that "are, to a large extent, not the result of the Commission's exercise of its characteristic institutional role,' which requires that it base its determinations

The Guidelines for white-collar offenses are not—indeed, never have been—the product of empirical data. According to Justice Breyer—one of the founding Sentencing Commissioners—when formulating those Guidelines, the Commission "decided to abandon the touchstone of prior past practice." Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988). Instead, the Commission *prescribed* what it viewed as an appropriate sentencing range for fraud offenses— in particular, a range designed to ensure at least some prison time. The certainty of *some* imprisonment, according to the Commission, would promote deterrence. *See, e.g.*, U.S.S.G., ch. 1, intro., pt. 4(d) (1987). Thus, in its first Fraud Guideline, the Commission required some form of confinement for all but the least serious cases, but prescribed a *maximum* range of *30-37 months* for defendants in Criminal History Category I. *See* U.S.S.G. § 2F1.1 (1987).

Subsequent amendments to the Guidelines have only further increased the severity and lack of proportionality, still not based on any empirical analysis.[12] Rather, these increases have been largely in response to pressure from other sources like members of Congress, DOJ, or the media. *See* Frank O. Bowman III, *Pour Encourager Les Autres?*, 1 Ohio State J. Crim. L. 373, 431-40 (2004) (explaining that the 2003 increases were due to intense pressure from DOJ and Congress); *see also* Jeffrey S. Parker & Michael K. Block, *The Sentencing Commission, P.M.*

---

on 'empirical data and national experience' but of frequent mandatory minimum legislation and specific congressional directives to the Commission to amend the Guidelines") (citing *Kimbrough*, 552 U.S. at 109); *United States v. Dorvee*, 616 F.3d 174, 184-88 (3d Cir. 2010) (discussing how the Sentencing Commission "did not use this empirical approach" in formulating certain Guidelines and encouraging district judges, when applying those Guidelines, to "take seriously the broad discretion they possess in fashioning sentences . . . bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results"); *United States v. Herrera-Zuniga*, 571 F.3d 568 (6th Cir. 2009) (finding that, under *Kimbrough* and *Spears v. United States*, 555 U.S. 261 (2009), courts can reject Guidelines based on the absence of empirical data analyzed by the Sentencing Commission).

[12] In 1989, there was an additional increase of 4 more loss levels under § 2B1.1. In 2001, there was an increase of another 5 levels under § 2B1.1. In 2003, following the Sarbanes-Oxley Act reforms, the base offense level was increased from 6 to 7 for certain fraud offenses and the loss table was extended to include larger loss amounts.

*(Post-Mistretta): Sunshine or Sunset*, 27 AM. CRIM. L. REV. 289, 320 (1989) (stating that the 1989 increases were "overtly political and inexpert").

The Fraud Guideline lacked an empirical basis when it was created. Over the years, the gulf between the Fraud Guideline and any empirical analysis has only grown. *See, e.g.*, *United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) (noting that the Fraud Guideline is particularly appropriate for variances because it was "not developed using an empirical approach based on data about past sentencing practices"); *United States v. Watt*, 707 F. Supp. 2d 149, 154 (D. Mass. 2010) (noting that the prescriptions of the current Fraud Guideline are "entirely inconsistent with prior practice, and not at all based on any real data or analysis"). This gulf has only been compounded by "factor creep," the persistent introduction of new sentencing enhancements. Bowman, *Sentencing High-Loss Corporate Insider Frauds After Booker* at 170. This trend has led to a draconian sentencing scheme in which "[a]ny case involving a corporate officer and a multimillion-dollar fraud will almost always trigger application of multiple offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing—conducting a big fraud in a corporate setting." *Id*.

Given the lack of any reasoned connection between the lengthy sentences recommended by the Guidelines and the conduct involved in most fraud cases, it is little wonder that even the government has acknowledged that the Fraud Guidelines "have lost the respect of a large number of judges" who have been disregarding those Guidelines "with increasing frequency." Letter from Jonathan Wroblewski, Director, Department of Justice Office of Policy and Legislation, to Hon. William K. Sessions II, Chair of the Sentencing Commission (June 28,

2010) at 2, 4.[13],[14] In fact, in recent years *within-Guidelines sentences for fraud dropped below 50 percent*, lower than any other major offense category.[15] *See* Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 OHIO ST. J. CRIM. L. 605, 621 (2021) (emphasis added); Mark  Allenbaugh, "*Drawn from Nowhere:" A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Reporter 2 (Oct. 2013) (emphasis added).[16]

---

[13] Mr. Wroblewski was the Department of Justice *ex officio* member of the Sentencing Commission.

[14] The criticism of the Fraud Guideline echoes that of the Drug Guidelines which, after years of criticism by practitioners and legal commentators, are finally being revamped.  On April 10, 2014, in a move endorsed by then-Attorney General Eric Holder, the Sentencing Commission voted unanimously to lower the federal drug base offense levels, and those amendments took effect November 1, 2014. *See* Sentencing Guidelines for United States Courts, 79 Fed. Reg. 25996 (proposed May 6, 2014), *available at* http://www.ussc.gov/sites/default/files/pdf/amendment-process/federal-register-notices/20140430_FR_Final_Amendments.pdf.  The draconian drug penalties were a significant driver of the increases in the offense levels for economic crime cases. *See* Frank O. Bowman III, *The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History*, 35 Ind. L. Rev. 5, 29 (2001) ("[T]o many observers, economic crime sentences still appeared quite low . . . by comparison with sentences imposed for other offenses (particularly narcotics)").

[15] The most recent statistics reveal that only 41.4 percent of sentences in fraud cases are within the Guideline Range. *See* U.S. Sentencing Comm'n, *Preliminary Quarterly Data Report:  2nd Quarter Release — Preliminary Fiscal Year 2024 Data Through March 31, 2024* (2024), at 17 (Table 10), *available at* https://www.ussc.gov/research/data-reports/quarter/quarterly-sentencing-updates (last visited Aug. 20, 2024). Courts frequently grant non-government sponsored downward variances, especially in cases involving first-time offenders. From 2015 to 2019, for example, courts granted non-government sponsored downward variances to first-time offenders in about 28 to 30% of cases. Boss & Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It* at 621.

[16] Because of the fundamental flaws identified by judges and commentators, in 2014, the American Bar Association Task Force on Economic Crimes released a draft fraud Guideline to remedy some of the current deficiencies. *See* Report on Behalf of the American Bar Association Task Force on The Reform of Federal Sentencing for Economic Crimes (Nov. 10, 2014), *available at* https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf. While still considering loss amount, the ABA proposal includes a "culpability" score and a "victim impact" score which help to mitigate the disproportionate effect of the loss enhancement. *Id.*

This approach mitigates the misguided focus on loss amount by (a) adjusting the loss point increases and (2) balancing loss with adjustments for culpability and victim impact. Under the ABA's proposed guidelines, the Defendants would be subject to a much lower enhancement for loss and the effect of the loss enhancement would be mitigated, or canceled out entirely, by a finding of "low" or "lowest" culpability. *See id.* Notably, judges have been receptive to the ABA Task Force proposal and continue to endorse its approach. *See, e.g.*, Transcript of Sentencing Hearing at 23:13-24:5, *United States v. Faibish*, No. 12-cr-265 (ENV) (E.D.N.Y. Mar. 10, 2016) ("The Court has reviewed [the ABA Task Force report] . . . and [it] persuades the Court that while the current guidelines system does not provide a reasonable way to achieve the kind of sentencing objectives the guidelines are supposed to achieve . . . the ABA task force guidelines certainly significantly move in that direction.  So that the Court finds those recommendations usable. . . . I will give you the benefit of what I like to think of as the shadow guidelines that control this case."); Transcript of Sentencing Hearing at 212:5-14, *United States v. Rivernider*, No. 10-cr-222 (RNC) (D. Conn. Dec. 18, 2013). ("I took a look at the ABA Task Force report on this guideline… I found that the

2)      **This Case Well Illustrates the Irrationality of the Sentencing Guidelines for Fraud Cases.**

The offense level recommended by the USPO in the PSR here well illustrates that the Fraud Guideline is deeply flawed.[17] Under the PSR's calculation, the Guidelines recommend imposing on a first-time, non-violent offender, a sentence comparable to that recommended for:

- assault with intent to commit murder (U.S.S.G. § 2A2.1, offense level 27);

- arson creating a serious risk of death or bodily injury (U.S.S.G. § 2K1.4, offense level 24);

- manslaughter (U.S.S.G. § 2A1.3, offense level 29); and

- unauthorized acquisition of and threat to use nuclear and biological weapons and other weapons of mass destruction (§ 2M6.1, offense level 30).

The notion that the Ms. Nadel should be punished at nearly the same offense level as someone who ***acquires and threatens to use a nuclear bomb*** illustrates the absurdity of the current Guideline ranges.

The sentence imposed here should take account of these critical Guideline deficiencies, rather than reflexively using a loss figure to arrive at a wildly inflated result. This is particularly true here, because Ms. Nadel received none of the criminal proceeds that form the loss amount. The Evans Family, with no legitimate source of income, was able to take exotic trips to Hawaii, San Francisco, Las Vegas, New Orleans, and Austin, Texas (for a Formula One race and Stevie Wonder concert) (FBI 302 from 10/31/17 proffer of Russell). Gina, just for herself, purchased

---

total offense level that emerged from the analysis was quite a bit lower than the one that emerges from this guideline… I think that there is much in the Task Force report that is helpful and I think that the guidance provided by their approach is preferable to what emerges from the existing guideline.").

In the absence of significant changes to §2B1.1 since the ABA Task Force issued its proposal in 2014, commentators continue to propose amendments aimed at mitigating its severity.  *See e.g.*, Boss & Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It* at 629 (proposing a return to the 1987 loss table while recognizing benefit of the ABA Task Force's more holistic approach).

[17] The PSR calculates Ms. Nadel at 30 before timely acceptance of responsibility and the departure under USSG §5K1.1 is applied.

a $150,000 diamond ring and two Rolex watches worth approximately $50,000 each (FBI 302 from 11/20/17 proffer of  Russell). The family received a Jeep Cherokee, Dodge Challenger GMC sport utility vehicle and a Bentley GT through money obtained by Hollie Nadel. (FBI 302 from 12/17/18 proffer of Russell). They even lived in an apartment in Marina del Rey, California, that was paid for entirely by Hollie Nadel. (same proffer 302). By contrast, Hollie lived out of a suitcase. The inflated nature of loss penalties should not hinder this Court from validly exercising discretion to sentence Ms. Nadel to probation.

This Court enjoys broad discretion regarding the extent of the variance warranted at sentencing. "[I]n post-*Booker* cases, the Supreme Court has emphasized the discretion of district courts to sentence within or outside the Guidelines."  *United States v. Gardellini*, 545 F.3d 1089, 1092 (D.C. Cir. 2008).   A downward variance does not require a showing of "extraordinary circumstances," *id.* at 1093, although they certainly exist here.  Instead, as the D.C. Circuit has explained, the question is, whether the sentence is reasonable, "giv[ing] due deference to the district court's decision that the §3553(a) factors, on a whole, justify the extent of the variance." *Id.* (quoting *Gall*, 552 U.S. at 51). "Under the clearly erroneous standards, the District Court's findings of fact [at sentencing] are presumptively correct." *United States. v. Mack*, 841 F.3d 514, 518 (D.C. Cir. 2016).

### D.      Factor Six: The Need to Avoid Sentencing Disparities

While federal prosecutions for *Klein* conspiracies are fairly common, there is almost no case that tracks the unique facts of this one.

While obviously every case merits individual treatment, and there are extraordinarily unique aspects of Ms. Nadel's character and conduct, it is not unheard of for courts to sentence individuals involved in conspiracies to commit bank fraud to probationary sentences. In this District, there have been a number of prosecutions under 18 U.S.C. § 371 where the sentencing

29

judge imposed probationary sentences. *See United States. v. Kpakima,* No. 1:09-cr-00038 (D.D.C. 2009) (60 months' probation, loss amount argued to be $1,089,903); *United States v. Crummy,* No. 1:16-cr-00133 (D.D.C. 2016) (12 months' probation, government claimed $1.6 million in loss); *United States v. Wickramasuriya,* No.1:18-cr-120 (D.D.C. 2018) (24 months' probation, government claimed intended loss of $250,000-$500,000); *United States v. Dacy,* No. 1:14-cr-00153 (D.D.C. 2014) (60 months' probation; government alleged over $4 million in scheme).

Within the case at hand, the sentencing results were as follows:

- Gina Russell:        Hobbs Act extortion, 125 months of imprisonment;

- Robert Evans:       Hobbs Act extortion, 60 months of imprisonment;

- Tony Evans:         Hobbs Act extortion, 60 months of imprisonment;

- Corry Evans:        Bank Fraud, 40 months of imprisonment;

- Archie Kaslov:      Conspiracy Wire Fraud, 30 months of imprisonment;

- Candy Evans:        Witness Tampering, 1 year and one day of imprisonment.

The inherent problem with comparing Hollie Nadel to any of the Evans Family members for purposes of determining a fair sentence is that the prospects of recidivism are diametrically opposed. On the one hand, there are defendants who shun schools, do not pay taxes, seek only illegitimate income, celebrate fleecing innocent people, and willfully obstruct justice with sham videos, statements, and marriages.

On the other hand, Hollie Nadel demonstrates every likelihood that this horrific chapter in her life is an anomaly. She has reunified with family, diligently pursued employment and proven herself a reliable employee, and shown absolute respect for the Court by complying with initially stringent conditions of release for seven years. She will not be back, unless it is to help other victims of human trafficking navigate the federal court system.

### E.     Factor Seven: The Need to Provide Restitution

Hollie Nadel never kept a penny of the dollars that passed through her hands to the Evans Family. PSR ¶ 68. In light of that fact, the usual default assessment of joint and several liability would be particularly draconian. Based upon the financial history of the Evans Family, it appears extremely improbable that *any* of those individuals will make significant contributions to the total loss amount of $4,217,542.86, other than from property already seized during their arrests. Hollie, on the other hand, would end up being saddled with an impossibly high financial burden and one to which she would undoubtedly make significant contributions while on supervised release. The irony of Nadel paying back the Evans Family's obligation should not be lost on this Court.

### i.  <u>The Legal Framework Applied to This Particular Case Supports Declining to Order Restitution.</u>

In 2014, Justice Kennedy suggested in dicta the principle that restitution imposed by, but not paid to, the Government may fall within the ambit of the Excessive Fines Clause under certain factual circumstances:

> The reality is that the victim's suggested approach would amount to holding each possessor of her images liable for the conduct of thousands of other independently acting possessors and distributors, with no legal or practical avenue for seeking contribution. That approach is so severe it might raise questions under the Excessive Fines Clause of the Eighth Amendment. To be sure, this Court has said that "the Excessive Fines Clause was intended to limit only those fines directly imposed by, and payable to, the government." *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 268, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). But while restitution under § 2259 is paid to a victim, it is imposed by the Government "at the culmination of a criminal proceeding and requires conviction of an underlying" crime, *United States v. Bajakajian*, 524 U.S. 321, 328 (1998). Thus, despite the differences between restitution and a traditional fine, restitution still implicates "the prosecutorial powers of government," *Browning-Ferris*, supra, at 275, 109 S.Ct. 2909. The primary goal of restitution is remedial or compensatory, cf *Bajakajian*, supra, at 329, but it also serves punitive purposes, see *Pasquantino v. United States*, 544 U.S. 349, 365, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005) ("The purpose of awarding restitution" under 18 U.S.C. § 3663A "is ... to mete out appropriate criminal punishment"); *Kelly*, 479 U.S., at 49, n. 10.  That may be "sufficient to bring [it] within the purview of the Excessive Fines Clause," *Bajakajian*, supra, at 329, n. 4, 118 S.Ct. 2028. **And there is a real question whether holding a single possessor liable for millions of dollars in losses collectively caused**

**by thousands of independent actors might be excessive and disproportionate in these circumstances.** These concerns offer further reason not to interpret the statute the way the victim suggests.

*Paroline v. United States*, 572 U.S. 434, 455-56 (2014) (emphasis added).  Here, like in *Paroline*, the Court should preserve the final punishment of a restitution obligation to those who truly benefitted from the scheme.

While the Supreme Court decision in *Honeycutt v. United States*, 581 U.S. 443 (2017) expressly addressed the concept of joint and several liability in the context of drug forfeiture, its underlying reliance upon fairness and Justice Sotomayor's conclusion that the entire statutory scheme was never intended to permit the extension of joint and several liability to equate radically different levels of culpability are important principles to acknowledge. This is particularly so in the unusual circumstance of massive profit in the hands of more culpable conspirators and conclusive proof of zero proceeds in those of Hollie Nadel.

### ii. Practical Concerns Also Augur in Favor of Delayed Consideration, At the Most.

Aside from the basic notions of fairness that apply here, there are also a number of seizures that have either already reduced the total obligation or will likely do so in the near future. To date:

- A total of $137,947.15 has been remitted to Mr. Browning, the victim of Zancan's embezzlement, stemming from the seizure and sale of two gold bars and two Rolex watches from Tony Evans;

- Another approximate $50,000 was provided from a seizure from Candy Evans;

- $6,900 was paid via the Treasury Offset Program from Tony Evans;

- The Government expects that the bulk of $110,500 from the resale of the 2009 Rolls Royce will be applied to restitution; and

- The Government expects that $20,000 seized from Tony Evans' residence will be applied to restitution.

There is every reason to believe that forfeited property will ultimately be applied to restitution, as is the expected process in any DOJ forfeiture. And there remains a significant quantity of materials that may reduce the total figure, including numerous pieces of jewelry and $40,840 seized from Mr. Zancan.

Further, there are forfeiture proceedings that reflect an individualized approach towards financial culpability in this case, such as Corry Evans agreeing to forfeit $772,500, Robert Evans facing $777,955, and Archie Kaslov forfeiting $1,057,682.86. The Government also informed the defense that Candy Evans and Mr. Kaslov are apparently contesting some part of their forfeiture, further complicating the clarity of the ultimate efforts to recoup losses.

In short, the restitution picture is evolving and complex. While the defense's position is that restitution should be left to the Evans Family and Mr. Zancan, if the Court is inclined to impose an obligation on Ms. Nadel, we would ask to set a separate restitution hearing roughly 90 days from the sentencing date, *see* 18 USC § 3664(d)(5), to allow for continued reduction of the offset amount and for negotiations between the parties to try to resolve the matter.

## V.    Conclusion

Hollie Nadel stands before this Court as a contrite woman. She has followed every condition of release with perfect focus and compliance. Hollie's cooperation with law enforcement has proven successful – including the prosecution of her tormentors. If the primary goal of this sentencing is to deter Ms. Nadel from criminal conduct and to facilitate her full rehabilitation, that goal can be achieved by a non-custodial sentence followed by a period of probation. Hollie Nadel already faces severe collateral and financial repercussions from this conviction, and after serving 56 days in jail upon her arrest, there is no further need to specifically deter her from crime. Her request of this Court is a simple one, but one with a tremendous amount of supporting evidence – rather than remove Hollie from her family and community, give her the ability to continue to prove

to this Court that her mistake will never be repeated. She can do so much more for family, community, and law enforcement, if given that opportunity.

DATED:      September 11, 2024                    Respectfully Submitted,

*/s/ James M. Trusty*

James M. Trusty
A.  Jeff Ifrah
Ifrah PLLC
1717 Pennsylvania Ave. NW
Suite 650
Washington, DC 20006
(202) 524-4140
(202) 524-4141 (fax)
jtrusty@ifrahlaw.com
jeff@ifrahlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 11th day of September, 2024, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties authorized to receive electronically Notices of Electronic Filing.

*/s/ James M. Trusty*_____
James M. Trusty
